# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br>1411 K Street, NW, Suite 1300<br>Washington, D.C. 20005<br><br>*and*<br><br>SIERRA CLUB,<br>2101 Webster Street, Suite 1300<br>Oakland, CA 94612<br><br>        Plaintiffs,<br><br>  v.<br><br>DAVID BERNHARDT, *in his official*<br>*capacity as Secretary of the United States*<br>*Department of the Interior*,<br>1849 C Street NW<br>Washington, D.C. 20240,<br><br>AURELIA SKIPWITH, *in her official*<br>*capacity as the Director of the United States*<br>*Fish and Wildlife Service*,<br>1849 C Street NW<br>Washington, D.C. 20240<br><br>UNITED STATES FISH AND WILDLIFE<br>SERVICE,<br>1849 C Street NW<br>Washington, D.C. 20240<br><br>*and*<br><br>UNITED STATES FOREST SERVICE,<br>1400 Independence Avenue SW<br>Washington, D.C. 20250<br><br>        Defendants. | **COMPLAINT FOR DECLARATORY**<br>**AND INJUNCTIVE RELIEF**<br><br>Case No.: |

## INTRODUCTION

1.     In this action, Plaintiffs challenge the U.S. Fish and Wildlife Service's ("FWS") issuance of, and the U.S. Forest Service's ("Forest Service") reliance on, a flawed Biological Opinion regarding the negative impacts to grizzly bears that arise from the Forest Service's authorization of continued livestock grazing in prime grizzly bear habitat within the Bridger-Teton National Forest, in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.

2.     Specifically, the Forest Service has authorized livestock grazing for cattle for ten years, through the 2028 grazing season, on numerous allotments in the Upper Green River Area Rangeland Project area ("Project"), encompassing the headwaters of both the Green and Gros Ventre River and approximately 170,643 acres.  The closest allotment lies less than 30 miles from the boundary of Grand Teton National Park.

3.     As a result of previous and ongoing livestock grazing, the Upper Green River Area represents the highest number of grizzly bear conflicts in the entire Greater Yellowstone Ecosystem ("GYE"), and thus has become a sink for grizzly bears.  Since 1999, 37 grizzly bears have been killed in the Project's action area, including 35 on the Upper Green grazing allotments.

4.     Recognizing that continued livestock grazing was likely to be detrimental to grizzly bears, the Forest Service initiated consultation with FWS as required under Section 7 of the ESA.  16 U.S.C. § 1536(a)(2).  Following consultation, FWS issued a Biological Opinion in 2019 ("2019 BiOp") approving the killing of up to 72 grizzly bears over the ten-year life of the

Project.  The anticipated and exempted lethal removal of up to 72 bears nearly doubles the number of grizzly bears killed in the project area over the past 20 years

5.      FWS concluded that despite the high number of bears that may be killed as a result of the authorized livestock grazing, the Project would not jeopardize grizzly bears.  FWS relied upon the Forest Service's commitment to implement enumerated conservation measures to reach its no jeopardy conclusion.

6.      Because FWS must rely upon the livestock permittees to implement several of the conservation measures, FWS cannot presume that the measures are reasonably certain to occur. Thus, FWS's reliance upon these conservation measures cannot satisfy the ESA's mandate to ensure that the grazing authorization will not jeopardize grizzly bears.

7.      Many of the conservation measures also contain vague language, lack specificity, are mere recommendations, or are subject to agency discretion.  Thus, even if the Forest Service is committed to enforcing the conservation measures, the unclear language and voluntary nature of the conservation measures makes it difficult for the agency to enforce them.

8.      Even if the Forest Service and the permittees fully implement the conservation measures, these measures are insufficient to protect grizzly bears or minimize conflicts in the project area, as explained in detail below.

9.      Furthermore, FWS acknowledged that grizzly bear mortality across the GYE is high and increasing but failed to consider whether the high level of take permitted by the 2019 BiOp may jeopardize the grizzly bear population in connection with the increasing mortality rates across the ecosystem.

10.     For these reasons, FWS's no jeopardy conclusion is arbitrary and capricious, and the Forest Service's reliance on that conclusion and the invalid 2019 Biological Opinion is unlawful.  5 U.S.C. § 706(2)(A).

## JURISDICTION AND VENUE

11.     This action arises under the ESA, 16 U.S.C. § 1531 *et seq*.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. §§ 2201-2202 (declaratory judgments and further relief); 16 U.S.C. §§ 1540(c), (g)(1)(c) (action arising under the ESA and citizen suit provision); and 5 U.S.C. § 702 (Administrative Procedure Act).

12.     Venue in this Court is proper pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because this civil action is brought against agencies of the United States and officers and employees of the United States acting in their official capacities under the color of legal authority, a substantial part of the events giving rise to the claim occurred in the District of Columbia, and no real property is involved in this action.  Plaintiffs Center for Biological Diversity and Sierra Club also maintain offices in this judicial district.

13.     Plaintiffs provided Defendants with 60 days' written notice of Plaintiffs' intent to sue on January 21, 2020, as required by 16 U.S.C. § 1540(g)(2)(C).

## PARTIES

14.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a non-profit organization that is dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with offices in Arizona, California, Colorado, the District of Columbia, Florida, Hawai'i, Idaho, Minnesota, Nevada, New Mexico, New York, North Carolina, Oregon, Washington, and Mexico. The Center has more than 74,000 active members,

including members within the grizzly bear's current and historic range.  The Center and its members have a long-standing interest in conserving native species in the American West and have routinely advocated for the conservation and protection of native species, including grizzly bears.

15.    The Sierra Club is a national non-profit organization with 67 chapters and more than 796,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  The Sierra Club and its members have advocated for grizzly bear recovery and protection of grizzly bear habitat in the Greater Yellowstone Ecosystem for more than 20 years.

16.    Plaintiffs, both organizationally and on behalf of their staff, members, and supporters, have deep and long-standing interests in the preservation and recovery of imperiled species, including grizzly bears in the Greater Yellowstone Ecosystem.  To further these goals, Plaintiffs have participated in various agency proceedings and public comment opportunities to protect and recover grizzly bears, including FWS delisting proposals and Forest Service projects that may negatively impact grizzly bears in and around the project area.

17.    Specific to the Upper Green River Area Rangeland Project, Plaintiffs actively participated in all stages of the Project, submitting comments throughout the National Environmental Policy Act process, including during initial scoping for the project, and providing comments on the Draft Environmental Impact Statement.  Following publication of a Final Environmental Impact Statement, Plaintiffs participated extensively in the objection process provided for under the National Forest Management Act.  Plaintiffs submitted two written

5

objections each, and participated in two objection process meetings with the Forest Service and other objectors.  Plaintiffs also submitted a written letter to the Forest Service following the mandatory objection process to summarize concerns about the Project, mainly highlighting apprehensions regarding the protection and conservation of grizzly bears in the project area.

18.     Plaintiffs' staff and members live near and regularly visit areas in and around the project area, often using these areas for various recreational pursuits, including to observe and photograph grizzly bears in their natural habitat.  Plaintiffs' staff and members have professional, spiritual, aesthetic, and recreational interests in wildlife that may be impacted by the Project. Plaintiffs' staff and members have visited and plan to continue travelling and recreating in these areas, and they will maintain an interest in preserving grizzly bears and grizzly bear habitat in and around the project area in the future.

19.     Plaintiffs' interests in protecting and recovering grizzly bears are directly harmed by the Defendants' approval of the Project.  By approving the killing of up to 72 grizzly bears in the project area, Plaintiffs' professional, spiritual, aesthetic, and recreational interests and enjoyment have been and will continue to be greatly diminished because the Project will thwart grizzly bear recovery and survival, decreasing Plaintiffs' opportunities to see grizzly bears in and around the project area.

20.     Plaintiffs also have an interest in the effective implementation of environmental laws aimed at protecting wildlife and wildlife habitat, including the ESA.  Plaintiffs are injured by Defendants' failure to comply with the ESA which they have violated by relying upon conservation measures that are not reasonably certain to occur and lack specificity to find that the Project will not jeopardize grizzly bears.

21.     Defendants' approval of the Project and reliance on the 2019 BiOp without complying with mandatory duties under the ESA and APA have harmed and will continue to harm Plaintiffs' interests.  The injuries described above are actual, concrete injuries presently suffered by Plaintiffs' staff and members and they will continue to occur unless this Court grants relief.  These injuries are directly caused by Defendants' actions and inactions, and the relief sought herein would redress those injuries.  Plaintiffs have no other adequate remedy at law.

22.     Defendant DAVID BERNHARDT is the Secretary of the United States Department of the Interior.  In this role, Secretary Bernhardt has supervisory responsibility over the United States Fish and Wildlife Service.  Secretary Bernhardt is sued in his official capacity.

23.     Defendant AURELIA SKIPWITH is the Director of the United States Fish and Wildlife Service and is charged with ensuring agency decisions comply with law.  Director Skipwith is sued in her official capacity.

24.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a federal agency within the Department of Interior.  FWS is responsible for administering the ESA with respect to terrestrial wildlife, such as grizzly bears, and ensuring that agency decisions comply with the ESA and other laws.

25.     Defendant UNITED STATES FOREST SERVICE is a federal agency within the U.S. Department of Agriculture.  The Forest Service is responsible for managing the lands and resources within the Bridger-Teton National Forest in accordance with federal laws and regulations, including the ESA and APA.

## STATUTORY BACKGROUND

26.     The Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any

nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  The ESA provides a means to conserve the ecosystems upon which endangered and threatened species depend and a program to conserve listed species.  16 U.S.C. § 1531(b). The ESA defines "conservation" as the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," *id.* § 1532(3), i.e. to bring about the recovery of species listed as endangered or threatened. *See id.* § 1532(6), (20) (definitions of "endangered species" and "threatened species").

27.     To receive the full protections under the ESA, a species must first be listed by the Secretary of the Interior as "endangered" or "threatened" pursuant to ESA section 4. *See id.* § 1533.  An "endangered species" is "any species which is danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

28.     Section 7(a)(2) of the ESA requires each federal agency, in consultation with a federal wildlife agency (FWS for the grizzly bear) to insure that any proposed action is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat. *Id.* § 1536(a)(2).  To "jeopardize the continued existence of" under the ESA means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

8

29.     To carry out these mandates, the action agency must first ask FWS whether any listed or proposed species may be present in the area of the agency action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If listed or proposed species may be present, the action agency must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action. 16 U.S.C. §1536(c)(1); 50 C.F.R. § 402.12. The biological assessment must generally be completed within 180 days. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(i).

30.     If an agency determines that its action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat, the regulations permit "informal consultation," during which FWS must concur in writing with the agency's determination. 50 C.F.R. §§ 402.14(a), (b). If the agency determines that the action is "likely to adversely affect" a listed species or critical habitat, or if FWS does not concur with the agency's "not likely to adversely affect" determination, the agency must engage in "formal consultation," as outlined in 50 C.F.R. § 402.14. *Id.* §§ 402.02, 402.14(a).

31.     After FWS evaluates the current status of the listed species and the proposed action's impacts on the species using the best scientific and commercial data available, FWS reaches a "biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species . . . ." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14(d), (g)(4). If FWS concludes that the proposed action "will jeopardize the continue existence" of a listed species, the biological opinion must outline "reasonable and prudent alternatives." 16 U.S.C. § 1536(b)(3)(A).

32.     In addition, FWS must provide an "incidental take statement" if FWS concludes that an action is not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, either as proposed or through the

9

implementation of the reasonable and prudent alternatives described in the biological opinion. The incidental take statement must specify the amount or extent of such incidental taking on the listed species; any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact; and the "terms and conditions" with which the action agency must comply to implement those measures. *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(i). Taking of listed species without the coverage of an incidental take statement is a violation of the ESA. 16 U.S.C. § 1538.

33.     A biological opinion produced through formal consultation under the ESA is a final agency action subject to judicial review under the arbitrary and capricious standard of the Administrative Procedure Act. *Bennett v. Spear*, 520 U.S. 154, 178 (1997); 5 U.S.C. § 706(2). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

34.     Even after the procedural requirements of consultation are complete, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency. An action agency's reliance on a flawed biological opinion to satisfy its ESA section 7 duty is arbitrary and capricious and unlawful under the ESA. 16 U.S.C. § 1536(a)(2); *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 146 (D.D.C. 2016).

## FACTUAL BACKGROUND

### I.  The Upper Green River Area Rangeland Project

35.     The Upper Green River Area Rangeland Project area, which encompasses the headwaters of both the Green River and Gros Ventre River, lies approximately 30 miles northwest of Pinedale, Wyoming in the Bridger-Teton National Forest.

36.     The project area is within the Greater Yellowstone Ecosystem, which the Forest Service describes as one of the largest intact ecosystems remaining in the temperate zones of the world.  Of the 170,643-acre project area, 17,818 acres lie in designated Wilderness areas—12,447 acres in the Gros Ventre Wilderness and 5,371 acres in the Bridger Wilderness.  And while the Forest Service's delineation of the project area does not include Grand Teton National Park, the closest grazing allotment lies less than 30 miles from the park boundary.

37.     The project area contains six grazing allotments:  Badger Creek, Beaver-Twin Creeks, Noble Pastures, Roaring Fork, Wagon Creek, and Upper Green River.  Allotment management plans and other direction permit approximately 9,089 livestock—including 9,042 cow/calf pairs and yearlings and 47 horses—to graze these allotments from June 14 to October 15 annually.

38.     There are 21 different people authorized to graze cattle and/or horses in the project area, for a maximum permitted use of approximately 46,148 animal unit months.  An animal unit month is the amount of forage for one mature cow or equivalent for one month based upon an average daily forage consumption of 26 pounds of dry matter.

39.     Prior grazing in the project area has led to negative impacts on wildlife, fish, water quality, soil quality, and vegetation.  The Record of Decision authorizes continued grazing in the project area for 10 more years, through the 2028 grazing season.

## II.  Grizzly Bears in the Greater Yellowstone Ecosystem

40.     Grizzly bears once ranged throughout most of western North America, from the high Arctic to the Sierra Madre Occidental of Mexico, and from the coast of California across most of the Great Plains.  Scientists believe that prior to European settlement, approximately 50,000 grizzly bears occupied the western United States between Canada and Mexico.  With European settlement of the American West and a federally funded bounty program aimed at eradication, grizzly bears were shot, trapped, and poisoned, reducing the population to just two percent of their historic range.

41.     Because of its precipitous decline, FWS listed the grizzly bear as a threatened species in the lower 48 states under the ESA in 1975.  Today scientists estimate there are less than 2,000 grizzly bears left in the lower 48 states, occupying five isolated populations.

42.     In the Greater Yellowstone Ecosystem, FWS and other agencies manage grizzly bears and their habitat by combining the Primary Conservation Area (the existing Yellowstone grizzly bear recovery zone as identified in the 1993 Grizzly Bear Recovery Plan) with adjacent areas where occupancy by grizzly bears is anticipated and acceptable.  Combined, these areas form the Demographic Monitoring Area, within which habitat is considered suitable to support grizzly bears and recovery criteria for grizzly bears are assessed.  The Upper Green allotments all lie within the Demographic Monitoring Area.

43.     Although grizzly bears in the Greater Yellowstone Ecosystem have increased under the protections of the ESA, these bears still face a host of threats.  For example, with the severe decline of traditional food sources such as whitebark pine seeds and Yellowstone

cutthroat trout, bears have been forced to seek food elsewhere and have turned to a more meat-based diet.  This alternative diet has brought grizzlies into more frequent contact with livestock and with humans, such as hunters.

44.     As a result, conflicts with grizzly bears within the GYE have been on the rise, leading to record-high numbers of grizzly bear mortalities in recent years.  The 2019 BiOp estimates 62 grizzly bear deaths in 2018, 66 in 2017, 58 in 2016, and 70 in 2015, compared with 28 grizzly bear mortalities in 2014 and 29 in 2013.

45.     The Upper Green area consistently represents the highest number of grizzly bear conflicts in the GYE.  Since 1999, a total of 37 grizzly bears have been killed in the project action area, including 35 on the Upper Green allotments.  Indeed, the Forest Service and FWS have determined that the area is a population sink for grizzly bears.

46.     In the GYE, home range estimates are 81 square miles for females and 309 square miles for males.  Thus, both males and females that reside primarily in Grand Teton National Park may have home ranges that overlap with the project area.

47.     Grizzly bears have one of the lowest reproductive rates of all terrestrial mammals in North America, resulting primarily from the late age at first reproduction (four and a half to five and a half years), small average litter size (two cubs), and the long interval between litters.  Scientists estimate that female grizzly bears may be able to produce two litters in a ten-year period, with one female surviving to reproductive age.  Thus, it takes an adult female grizzly bear approximately ten years to replace herself in the wild.

48.     The survival of a female grizzly bear and her cubs enables the grizzly population to grow.  Thus, the 1993 Grizzly Bear Recovery Plan found that "providing maximum protection

for females is essential to recovery."  And FWS notes that the long-term survival of grizzly bears

in the GYE is contingent upon minimizing annual mortality rates, especially for adult females.

49.     The project area is currently occupied by grizzly bears, including females with

cubs.  Despite the project area's known history as a hotspot for grizzly bear conflicts and

associated mortalities, neither the Forest Service nor FWS provide an estimate as to how many

female grizzly bears may use lands in the project area, but FWS acknowledges that there has

been an increase in the use of the area by female bears with dependent young.

## III.  The Forest Service's Consultation History with FWS

50.     As required by section 7 of the ESA and in response to livestock-grizzly bear

conflicts in the Upper Green, the Forest Service has engaged in a series of consultations with

FWS to assess the impacts of livestock grazing on grizzly bears.

51.     In 1997, the Forest Service drafted a Biological Assessment ("BA") to assess the

impacts of livestock grazing on grizzly bears on six of the nine permitted allotments in the Upper

Green area.  In 1999, the Forest Service amended that BA and initiated formal consultation with

FWS.  Following formal consultation, FWS issued a Biological Opinion ("1999 BiOp") on

grazing in the Upper Green.  In the 1999 BiOp, FWS anticipated and permitted through an

Incidental Take Statement ("ITS") the lethal removal of up to five grizzly bears over an

indefinite period of time in the Upper Green area.  The 1999 BiOp limited permitted take to four

males and one female grizzly bear.

52.     In 2009, the Forest Service reached the level of take identified in the 1999 BiOp

and consequently reinitiated consultation with FWS in 2010.  In its request for further

consultation, the Forest Service expanded the area for consideration to encompass three new

allotments in the Upper Green area.  In 2011, FWS issued an amended BiOp ("2011 BiOp") that

anticipated the lethal removal of six grizzly bears within any consecutive three-year period.

14

53.     The following year, in August 2012, the Forest Service determined that it had reached the level of incidental take identified in the 2011 BiOp, lethally removing six grizzly bears, and again reinitiated consultation.  Later that same month, another grizzly bear was killed, and anticipated take was exceeded.  In total, seven grizzly bears were lethally removed during the 2011-2012 grazing seasons, including 4 bears in 2011 and 3 bears in 2012.

54.     In response, FWS decided to provide "an amended, short-term ITS to the Forest," authorizing the lethal removal of three additional grizzly bears through the end of the 2012 grazing season. No additional grizzly bears were lethally removed through the end of the 2012 grazing season.

55.     In April 2013, the Forest Service reinitiated formal consultation.  In response, FWS issued a revised BiOp anticipating the incidental take of no more than 11 grizzly bears within any three-year period.  Permitted take was limited to eight males and three females.

56.     By the end of the 2013 grazing season, four grizzly bears had been lethally removed, including two males and two females.  Because the Forest Service anticipated that additional females would be killed before the end of the consecutive three-year period, the Forest Service once again reinitiated formal consultation in January 2014.

57.     In 2014, FWS issued another BiOp ("2014 BiOp") and yet again increased the number of grizzly bears that could be lethally removed in the Upper Green area as a result of livestock grazing.  The 2014 BiOp exempted the lethal take of 11 grizzly bears and the relocation of 18 grizzly bears within any three-year period.  The 2014 BiOp, valid through the end of 2019, no longer established separate take allocations by sex.  From 2014 to 2018, 23 grizzly bears were lethally removed.  These lethal removals exceeded the level of exempted take in the 2014 BiOp (for example, 13 bears were killed within the 2015-2017 three-year period, and 15 bears were

killed in the three-year period from 2016 to 2018).  Nevertheless, FWS did not issue a new

Biological Opinion until it issued the 2019 BiOp, challenged here.

**IV.  The 2019 BiOp**

58.     While the Forest Service was considering its options related to the authorization

of the Upper Green River Area Rangeland Project, it reinitiated consultation with FWS after

determining that most of the Project alternatives under consideration were likely to adversely

affect grizzly bears.  Although a 2016 Supplemental Wildlife Specialist report stated that the

Forest Service would prepare a new biological assessment to obtain a new biological opinion for

the Project, the Forest Service never prepared one. Nevertheless, without the benefit of a new

biological assessment, on April 29, 2019, FWS issued the 2019 BiOp.

59.     In the 2019 BiOp, FWS assessed the impacts from the Project on grizzlies in its

defined action area, which FWS delineated as the grazing allotments plus a 7.5-mile buffer.

FWS chose the boundaries of the action area based upon the agency's interpretation of a 1982

study finding that grizzly bears may generally be drawn to carcasses from a distance of 7.5 miles

away.  In accordance with ESA regulations, the identified action area is meant to reflect "all

areas to be affected directly or indirectly by the Federal action and not merely the immediate area

involved in the action."  50 C.F.R. § 402.02.

60.     FWS predicts in the 2019 BiOp that grizzly bear occupancy and conflicts in the

Project's action area are likely to increase, noting that the number of conflicts in the area has

increased by an average of 9 percent per year since 2010.  As a result, FWS predicts the desire

for lethal removal of grizzly bears will also rise.  To account for the anticipated increase in

grizzly bear occupancy in the action area, FWS approved an ITS exempting the lethal removal of

up to 72 bears over the ten-year life of the Project.  This ITS thus authorizes the lethal removal of

nearly double the number of bears that have been lethally removed in the project area over the past 20 years (37 bears) in half the time.

61.     FWS states that it will review the accuracy of its estimates on the basis of consecutive three-year periods, rather than setting an expectation as to how many bears will be killed on a yearly basis.

62.     Unlike many of the previous biological opinions for the Upper Green area, and despite the importance of female grizzly bear survival for grizzly bear recovery, the ITS does not have a limit on the basis of sex.  Therefore, out of the 72 exempted lethal removals, there is no limit as to how many female grizzly bears may be killed.  FWS fails to explain why it did not include a limit on female take even though it included such a limitation in previous iterations of the BiOp.

63.     FWS acknowledges that females with cubs are increasingly establishing home ranges in the project area and more females may thus be killed for livestock conflicts in the project area than in the past.

64.     Despite FWS's authorization of lethal removal of a large number of grizzly bears, and the absence of a limit on how many female grizzly bears may be killed, FWS concludes that the Project will not jeopardize grizzly bears.

65.     In reaching this no-jeopardy determination, FWS relies heavily on the Forest Service's commitment to implement the conservation measures contained within the BiOp.

66.     The conservation measures are generally meant to prevent grizzly bear conflicts with cattle in order to limit the number of management removals of grizzly bears.  They include bear sanitation guidelines and recommendations for allotment monitoring, watching for sick or

injured cattle, moving carcasses in some circumstances, and meeting with permittees. The full list of conservation measures is provided in Exhibit 1. *See also* 2019 BiOp at 7-8.

67.   FWS assumed that the conservation measures will effectively protect grizzly bears even though many of the actions described in the conservation measures have been in place for years with no reduction in the number of reported grizzly bear conflicts from previous years.

68.   FWS must rely upon the Forest Service or the permittees to implement many of the conservation measures. FWS presumes that the Forest Service will enforce any failure by the permittees to implement the conservation measures.

69.   Nevertheless, FWS premised its conclusion that the Project is not likely to jeopardize grizzly bears on the Forest Service's commitment to implement and enforce the specified conservation measures, as noted in the 2019 BiOp. FWS states: "After reviewing the specialists [sic] report, the current status of the grizzly bear in the action area, previous sources of information incorporated by reference (see literature cited), *and the Forest Service's commitment to implement their Conservation measures*, and cumulative effects, it is the Service's biological opinion that the effects of livestock grazing on the Allotments in the northern portions of the Bridger-Teton National Forest's Pinedale Ranger District, west of the Wind River Mountain Range, as proposed, are not likely to jeopardize the continued existence of the grizzly bear." 2019 BiOp at 46 (emphasis added).

70.   FWS does not acknowledge that many of the conservation measures are voluntary or discretionary, are vague and lack specificity, and are not reasonably certain to occur because FWS must rely upon the Forest Service and permittees to implement them. Moreover, FWS fails to offer any specific and binding plans for implementing the conservation measures, instead

relying upon permittees to take the required actions and relying on the Forest Service to enforce them.

71.     Additionally, many of the conservation measures, even if consistently implemented, will not be effective in protecting grizzly bears.  For example, Conservation Measures 4 and 5 include requirements to move carcasses.  Conservation Measure 4, however, only requires carcasses in the allotments to be moved, "if possible," at least 0.5 miles from identified facilities, trailheads, or roads and at least 0.25 mile from live streams, springs, lakes, riparian areas, system roads and trails, developed recreation areas, dispersed camping sites, and picnic sites.  Nothing prevents the permittees from moving the carcasses deeper into the grazing allotments to accomplish this goal.  Thus, while this conservation measure may be good from a public safety standpoint, it does little to protect grizzly bears that generally will avoid roads and places with high human presence anyway.  In fact, moving the carcasses away from roads but not removing them from the project area or destroying them may actually draw grizzly bears deeper into the project area, creating a higher risk of cattle being susceptible to grizzly bear predation.

72.     Several of the conservation measures also contain vague language, making it impossible to ensure consistent implementation and enforcement.  For example, Conservation Measure 3 states that "Forest Service employees designated by the Pinedale Ranger District will monitor allotments *on a regular basis*."  *Id.* at 7 (emphasis added).  But the Conservation Measure does not explain what constitutes "a regular basis" or explain what type of monitoring is required, instead leaving these measures open to interpretation.  By contrast, in the 2014 BiOp's Terms and Conditions, FWS required the Forest Service to define what "regular" monitoring would be, including documentation explaining how and when monitoring would be conducted.  This important requirement, which would provide much-needed specificity as to

what monitoring will look like and thus how effective it may be, has been removed from the

2019 BiOp.  Without more direct and enforceable language, and specific explanations of how

and when the Forest Service will conduct monitoring, Conservation Measure 3 ensures little

protection for grizzly bears.

73.     Other conservation measures may not even occur because they are voluntary or

are mere recommendations.  Under Conservation Measure 6, for example, the Forest Service

"will recommend" that all permittees and their representatives carry bear spray while working

within the allotments, and additionally recommend that bear spray is holstered or carried so that

it can be readily accessible should a grizzly bear encounter occur.  FWS cannot assume that

recommended actions are reasonably certain to occur, however, and thus cannot rely on this

conservation measure as sufficient to mitigate the negative impacts to grizzly bears from the

Project.

74.     Finally, Conservation Measures 7, 8 and 9 all involve future meetings or

assessments to identify other means of reducing conflicts.  While Plaintiffs support the

commitment to monitor and assess the effectiveness of the conservation measures in the future,

these measures do not provide any definitive actions that will be taken to protect grizzly bears.

75.     FWS also relies upon the demographic recovery criteria mortality thresholds

found in the 2017 Supplement to the 1993 Recovery Plan and the 2016 Conservation Strategy to

rationalize its conclusion that the killing of 72 grizzly bears over the next ten years will not

jeopardize grizzly bears.  The demographic criteria thresholds use a sliding scale to determine

acceptable mortality rates for any sex/age class based upon the current estimated population size.

Given the 2017 estimated population size of 718, the mortality threshold is 9 percent for

independent females and dependent young and 20 percent for males.  These mortality limits are meant to preclude population-level impacts.

76.     FWS explains that because the Forest Service has a commitment to maintain a recovered population, the increased take permitted through the 2019 BiOp will not lead to any exceedance of the mortality thresholds currently in place, and thus will not impact the survival and recovery of the grizzly bear population.

77.     This rationale, however, ignores the high levels of mortality across the rest of the GYE's Demographic Monitoring Area within which these mortality limits apply.  For example, the BiOp recognizes there were 59 documented mortalities within the DMA in 2017, including 12 known and probable female mortalities, which is 8.4 percent of the 2017 population.  There is no reason to believe that mortality rates across the DMA will decrease over the next ten years. In fact, FWS acknowledges that human-grizzly bear interactions and conflicts have been increasing in the GYE.  Thus, while the 8.4 percent mortality level for females is below the 9 percent mortality threshold, the 2019 BiOp and ITS permits an increase in take of females in the DMA, which may lead to the 9 percent threshold being exceeded.  FWS does not consider whether the increased mortality permitted by the 2019 BiOp, with no limit on female take, may lead to an exceedance of the demographic criteria mortality thresholds when added to reasonably foreseeable mortality rates across the DMA over the next ten years.

78.     Moreover, FWS's presumption contradicts its own conclusion that mortality across the GYE may rise above current levels, noting that "[b]ecause more bears are moving into areas with more human and livestock use, we expect even more conflicts and management actions will occur in the future."  2019 BiOp at 29.

79.     FWS's presumptions that the increased amount of take in the 2019 BiOp and ITS, in addition to the likelihood of increased mortality across the GYE, will not exceed the recommended mortality thresholds and thus will not jeopardize the grizzly bear population fails to consider an important aspect of the problem by failing to account for high and increasing mortality rates across the GYE.

## FIRST CAUSE OF ACTION

### (FWS's Violation of the ESA and APA)

80.     Plaintiffs hereby incorporate all preceding paragraphs.

81.     FWS's reliance on implementation of the conservation measures to conclude the Project will not jeopardize grizzly bears is arbitrary because the conservation measures are not "certain to occur." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861 (D. Or. 2016); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987)).

82.     FWS has not shown that the conservation measures are "certain to occur" because FWS must rely upon the Forest Service or permittees to implement them.  Reliance on the proposed actions of others does not satisfy the ESA's mandate that agencies insure their actions will not jeopardize protected species.  *See Sierra Club*, 816 F.2d at 1385 (citing *Nat'l Wildilfe Fed'n v. Coleman*, 529 F.2d 359, 374 (5th Cir. 1976)).

83.     Here, although the 2019 BiOp claims that the Forest Service will require implementation of the grizzly bear conservation measures, 2019 BiOp at 7, "even a sincere general commitment to" implement the conservation measures is inadequate "absent specific and binding plans."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008).

84.     FWS fails to offer any specific and binding plans for implementing the conservation measures, instead relying upon permittees to take the required actions and relying upon the Forest Service to enforce them.  The Forest Service's enforcement actions are completely discretionary and even more tenuous given the discretionary language in the conservation measures themselves.

85.     Reliance on conservation measures to support a no-jeopardy opinion is additionally only appropriate if the conservation measures include "deadlines or other-wise enforceable obligations" and "address the threats to the species in a way that satisfied the jeopardy and adverse modification standards." *Rumsfeld*, 198 F. Supp. 2d at 1152.  Here, however, the conservation measures contain vague language, lack specificity, and are voluntary or discretionary, making enforcement difficult.  And as explained above, the conservation measures are not effective in protecting grizzly bears.

86.     Moreover, to support its no-jeopardy opinion, FWS presumes that increasing the permitted take of grizzly bears under the 2019 BiOp and ITS to 72 lethal removals over the next ten years, with no limits on female take, will not cause population-level impacts to rise to a level that would jeopardize the grizzly bear population.  FWS specifically determines that the permitted level of take will not exceed the mortality thresholds as established in the 2017 Supplement to the 1993 Grizzly Bear Recovery Plan and the 2016 Conservation Strategy.

87.     FWS acknowledges that mortality rates across the GYE are high and increasing, but does not take this into account when estimating whether the anticipated increase in ecosystem-wide mortality, coupled with the increased level of take in the Upper Green, would cause an exceedance of the established mortality thresholds.  This may be especially problematic for females with cubs, given the mortality thresholds are low (9 percent), and FWS has

23

acknowledged that females with cubs are increasingly establishing home ranges in the project area.

88.     The conservation measures are not reasonably certain to occur, because FWS must rely on others to implement them; lack specificity; are vague and unenforceable; and even if implemented will not be effective in protecting grizzly bears. Thus, FWS's reliance on the conservation measures to support the 2019 BiOp's finding that the Project will not jeopardize grizzly bears is arbitrary, capricious, and not in accordance with law.  5 U.S.C. § 706(2)(A).

89.     Similarly, FWS's presumption that increasing permitted take under the 2019 BiOp and ITS without considering how this may contribute to high and increasing mortality across the GYE to support the 2019 BiOp's no-jeopardy opinion entirely fails to consider an important aspect of the problem and is therefore arbitrary and capricious.  *Id.; Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## SECOND CAUSE OF ACTION

### (The Forest Service's Violation of the ESA and APA)

90.     Plaintiffs hereby incorporate all preceding paragraphs.

91.     Because the no-jeopardy determination in the 2019 BiOp was arbitrary and unlawful for the reasons stated above, the Forest Service could not lawfully rely on that document to discharge that agency's own ESA responsibilities in connection with lethal removal of grizzly bears in the project area.

92.     The ESA requires each agency to "insure that any action authorized, funded, or carried out . . . is not likely to jeopardize the continued existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2).  "Consulting with FWS alone does not satisfy an agency's duty under the Endangered Species Act."  *Resources Ltd., Inc. v. Robertson*, 35 F.3d

1300, 1304 (9th Cir. 1994).  Because "[a]n agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species[,] its decision to rely on a FWS biological opinion must not have been arbitrary or capricious."  *Id.* at 1304 (citation and quotations omitted).  *See also Mayo*, 177 F. Supp. 3d at 146 (finding Forest Service's reliance on faulty biological opinion unlawful).

93.     The Forest Service violated the ESA by arbitrarily and capriciously relying on FWS's unlawful 2019 BiOp to satisfy the its duties under the ESA in connection with the anticipated killing of grizzly bears as a result of the Upper Green Project.

94.     Even apart from its reliance on the 2019 BiOp, the Forest Service's authorization of the Project contravenes the no-jeopardy mandate of section 7(a)(2) of the ESA because the Forest Service has no valid factual basis for believing that the conservation measures on which it is relying will in fact be carried out.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that FWS and the Forest Service violated the ESA in connection with FWS's issuance of the 2019 BiOp and the Forest Service's reliance on that document to authorize the Upper Green River Area Rangeland Project;

2.     Set aside FWS's 2019 BiOp and remand the issue of grizzly bear take in connection with the Project for further action consistent with the requirements of the ESA;

3.     Enjoin implementation of all aspects of the Project unless and until Defendants demonstrate compliance with the ESA;

4.     Award Plaintiffs their reasonable attorneys' fees, costs and expenses associated with this litigation; and

5.      Grant such further and additional relief as the Court deems just and proper in

order to remedy the violations of law alleged herein.


Dated: March 31, 2020                  Respectfully submitted,

                                       /s/ Andrea Santarsiere
                                       Andrea Santarsiere
                                       (Idaho Bar No. 8818)*
                                       Center for Biological Diversity
                                       P.O. Box 469
                                       Victor, ID  83455
                                       Tel.: (303) 854-7748
                                       Email: asantarsiere@biologicaldiversity.org

                                       William J. Snape, III
                                       (D.C. Bar No. 455266)
                                       Center for Biological Diversity
                                       1411 K Street, NW, Suite 1300
                                       Washington, D.C.  20005
                                       Tel.: (202) 536-9351
                                       Emails:  bsnape@bioogicaldiversity.org,
                                       wsnape@wcl.american.edu

                                       *Attorneys for Plaintiffs*

                                       *Seeking admission pro hac vice

# EXHIBIT 1

**Conservation Measures**

Conservation measures are consistent with the standards, guidelines, management emphasis for the desired future conditions identified in the Forest Plan and, therefore, are part of the proposed action. The commitments made by the action agency are to contribute to the recovery of the grizzly bear. The FEIS grizzly bear management objective is to minimize the livestock related grizzly bear mortalities. The conservation measures and commitment to grizzly bear recovery identified in the FEIS provide for a balance between livestock grazing management and minimizing grizzly bear conflicts with livestock, in addition, minimizing grizzly bear/human safety concerns.

To help prevent conflicts with grizzly bears in the Upper Green Project Area, the Forest will require implementation of the grizzly bear conservation measures listed below. By reducing the availability of anthropogenic food; decreasing the number of sick, injured, isolated livestock in the allotments; and by removing livestock carcasses, livestock-grizzly bear conflicts will decrease, lowering the number of management removals within the action area.

(1) Bear Sanitation Guidelines will be followed for all camps associated with livestock operations as described and defined in Food Storage Order 04-03-330. Where outdoor toilets are available in Range Camps, keep doors closed and make toilets as "bear proof" as possible.
(2) Riders are required to watch all livestock closely for sick, injured, or stray animals.
(3) Forest Service employees designated by the Pinedale District Ranger will monitor allotments on a regular basis.
(4) On Cattle Allotments: a) all carcasses **located within 0.5 mile** of Green River Lakes Road, Union Pass Rd, FS 605, 660, 663B and 663C, GRL and Whiskey Campgrounds, private cabins, Kendall and Fish Creek guard station, permitted cow camps, permitted outfitter camps, Waterdog Lakes, and North Beaver and Tosi trailheads will be removed if possible or moved so that the carcass is at least **0.5 mile away** from the above described facilities, trailheads or roads;  b) all carcasses in locations not described in 1 above that pose a health or safety hazard to the public or to the environment will be removed if possible or moved so that the carcass is at least **0.25 mile from** live streams, springs, lakes, riparian areas, system roads and trails, developed recreation areas, dispersed camping sites, and picnic sites; and c) all sick or injured animals will be removed or treated. In the event that compliance with this measure is not physically possible, an exception may be granted per the discretion of the Pinedale District Ranger and/or his designated representative. In the event that rider safety is deemed an issue, an exception may be allowed as described in CM #5 below.
(5) Exceptions to requirements for removing or moving carcasses described in **CM #4** may be granted by the Pinedale District Ranger and/or his/her designated representative if human rider or herder safety is of concern. Rider or herder safety concerns include the possible presence of a grizzly bear in the immediate vicinity of carcasses, and carcasses being located in hazardous terrain such that attempting to move or remove may not be possible or unsafe. In such cases, a USFS employee or the WGFD bear specialist will be notified immediately of the hazard location and need for exception.

(6) The Forest will recommend that all permittees and their representatives (herders, riders, or other employees) carry bear spray while working within allotments.  Additional recommendations are that spray canisters be holstered or otherwise carried so that they are available for use in the event of encounters with bears; storing spray canisters in back packs, saddle bags, and vehicles are acceptable methods of storage during non-working time periods. Only brands of Bear Spray certified by the Interagency Grizzly Bear Committee are recommended.

(7) Continue to identify and implement opportunities that reduce the potential for grizzly bear conflicts. The Forest has investigated and explored additional means of reducing grizzly bear-livestock conflicts, which included assessments of:  a) cattle herding; and, b) where appropriate, and when permittees are willing participants, study sites may be developed within allotments to "test" new management actions.

(8) Through the permitting process and at annual meetings, the USFS will make grazing permittees aware of their responsibilities under the Endangered Species Act (ESA) in regards to laws and regulations concerning the taking of grizzly bears (Interagency Grizzly Bear Guidelines).

(9) Continue to work in cooperation with the Service, the Wyoming Game and Fish Department, and the Interagency Grizzly Bear Study Team to identify and collect information related to the habitat use, survival, reproduction, and depredation tendencies of grizzly bears inhabiting Livestock Grazing Allotments on Northern Portions of the Pinedale Ranger District.

**Action Area**

The action area is defined as all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action.  Noise may be caused by the sounds of livestock, herders, riders, dogs, etc. and will extend beyond the boundaries of the grazing allotments.  The spatial extent of livestock scent and noise on adjacent lands is highly variable and depends on topographic and weather conditions, the ability of species (e.g., humans or grizzly bears) to detect scents, and the condition of livestock (live or dead).  The distance grizzly bears would detect livestock grazing-related odors and noise outside of the allotment is unknown, because grizzly bears are suspected to have a keen sense of smell (Craighead 1976), much greater than that of humans. Craighead (1976) documented grizzly bear movements of approximately l8 miles to feed on a carcass but did not explain how or when the carcass was detected or how researchers attributed the bears' movement to carcass presence.  Detectability appears to be site specific.  Another grizzly took 60 hours to locate a carcass 1.7 miles away when wind conditions were unfavorable (Craighead 1976).  These studies of wild prey carcasses suggest that grizzly bear movement towards the scent of such carcasses is highly variable, and depends on the individual bear, the prey item, weather and topographic conditions, or other factors such as available food resources.  Craighead and Mitchell (1982) reported that many grizzly bears moved distances of 5 to 12 km (3.1 to 7.5 miles) to carcasses in Yellowstone National Park, and one adult male moved 30 km (18.6 mi).  The smell emanating from carcasses is different from live animals, both of which occur on the allotment.

For purposes of defining the action area, we selected a distance of 7.5 mile beyond the perimeter of the collective allotment boundaries based on the maximum distance many of the bears